UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| INCIDENT CATERING SERVICES, LLC, *doing business as* ELLIPSE GLOBAL a Limited Liability Company,<br><br>　　　　　Plaintiff,<br>　　v.<br><br>KENNETH ERROL NANCE, an individual,<br><br>　　　　　Defendant. | Case No.:<br><br>COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES<br><br>JURY DEMAND |

## **COMPLAINT**

Plaintiff, Incident Catering Services, LLC, doing business as Ellipse Global ("Ellipse Global" or the "Company"), by and through its attorneys, for its Complaint against Defendant Kenneth Errol Nance ("Nance" or "Defendant"), states as follows:

## **PRELIMINARY STATEMENT**

1.　　This is an action by Ellipse Global to recover substantial amounts of confidential and proprietary information misappropriated by Nance, its former National Director of Sales, and to enforce its contractual rights to prevent him from further unlawful competition. Ellipse Global

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES 1
61685-001\103016737

also seeks to recover wage overpayments inadvertently made to Nance due to administrative accounting errors.

2.     More specifically, in the weeks leading up to the cessation of his employment, Nance repeatedly connected a USB Maxtor Y080KO 80 GB hard drive ("Maxtor Hard Drive") to his work-issued computer.  Between December 28, 2021 and January 20, 2022, a user with the profile "Ken Nance" opened at least 60 files and folders that existed on the Maxtor Hard Drive, including files that upon review contain Ellipse Global proprietary and confidential information. Additionally, forensic examination determined that approximately 38,000 files and folders (or approximately 60 GB of data) had a Last Access Date updated between December 29, 2021 and January 21, 2022.  Based on a forensic review by J. Christopher Racich, a certified forensics examiner who has been qualified as an expert in computer forensics no less than 40 times, this metadata profile indicates that it is likely that the entirety of these files and folders were copied to the Maxtor Hard Drive in the weeks immediately preceding Nance's departure from Ellipse Global.

3.     Moreover, despite refutation to the contrary, Nance has been professionally affiliated with Ellipse Global's competitor USA Up Star LLC ("USA Up Star").  While still employed by Ellipse Global, Nance sought to lure at least one of his direct reports to join him at USA Up Star, and also sought to divert Ellipse Global clients and business opportunities to USA Up Star.

4.     Ellipse Global seeks to secure equitable relief and monetary damages from Nance for misappropriating its trade secrets and confidential information and for breaching his contractual and common law obligations to the Company.

STOKES LAWRENCE, P.S.
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

## THE PARTIES

5.      Ellipse Global is an incident response company registered as a Washington Limited Liability Company.  Ellipse Global's principal place of business is located in Monroe, Washington.

6.      On information and belief, Defendant Kenneth Errol Nance is a Washington citizen living at 210 119th Drive SE, Lake Stevens, WA 98258.  Nance worked for Ellipse Global as its National Director of Sales, based out of Lake Stevens, Washington, and continued in that role until his separation from employment on January 21, 2022.

## JURISDICTION AND VENUE

7.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331, because the Company alleges violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*, a federal statute.

8.      This Court has supplemental jurisdiction over Plaintiff's related state law claims against Nance pursuant to 28 U.S.C. § 1367.

9.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(a) because Nance resides in this judicial district and because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## STATEMENT OF FACTS

### The Business of Ellipse Global

10.     Ellipse Global, is one of the largest integrated mobile disaster support services and disaster relief companies in North America.  Ellipse Global, along with corporate affiliate OK'S Cascade, is a market leading provider of full-service turn-key mobile base camp and mobile catering services throughout the United States, Canada and select international locations.

11.     Ellipse Global maintains and deploys a large fleet of specialized mobile disaster support equipment and containerized solutions including mobile kitchen trailers, freezers, refrigerators, storage, mobile shower trailer units, mobile laundry trailer units, shelters, base camp tents, mobile command center trailers and related amenities to support first responders and event personnel.

12.     On November 23, 2021, GardaWorld Federal Services ("GWFS") acquired Ellipse Global.  Ellipse Global maintains its distinct legal identity.

**Defendant Nance's Work for Ellipse Global**

13.     Ken Nance began working for Ellipse Global on January 5, 2016 as an Outside Sales Manager working out of the Company's main office in Monroe, Washington.

14.     On or about August 25, 2020, Ellipse Global promoted Nance to become its National Director of Sales.  In this role he reported directly to Ellipse Global President Michael A. Holm ("Holm") and had a team of three employees who supported his oversight of the sales function of the company.   One of the three employees who reported to him was Business Development Manager Alanna Caffarel.

15.     As the National Director of Sales, Nance was responsible for the overall management of sales.  He was charged with establishing sales objectives by forecasting and developing annual sales quotas and sales initiatives, developing sales action plans, maintaining sales volume and pricing, and meeting with customers to discuss their needs and the quality of the Company's relationships, among other objectives set forth in his written job description.

16.     In 2021, Nance received a $90,000 salary and a six-figure commissions offering.

17.     As part of his new role as National Director of Sales, Nance signed an offer letter on August 25, 2020 and entered into a Confidential Information and Invention Assignment Agreement ("Confidentiality Agreement") on August 31, 2020.  A true and accurate copy of the

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES 4
61685-001\103016737

August 25, 2020 offer letter is attached as **Exhibit A**. A true and accurate copy of Nance's Confidentiality Agreement is attached hereto as **Exhibit B**.

18.     Nance's offer letter included contractual duties to devote his full business efforts to his employer, to refrain from outside employment or business activity that would create a conflict of interest with his employer, and to refrain from work that is competitive with the business of the Company. Nance's Offer Letter is a valid and binding agreement supported by mutual assent and consideration.

19.     Additionally, through the Confidentiality Agreement, Nance agreed that "[a]t all times during the term of the Relationship and thereafter," he would not use or disclose Ellipse Global's confidential information other than for the benefit of the company to the extent necessary to perform his obligations. He specifically agreed that he would "not disclose to any person, firm, corporation, or other entity" Ellipse Global's confidential information, and that he would "not make copies of such Confidential Information" except as authorized.

20.     Under the Confidentiality Agreement, "confidential information" was broadly defined to include "any and all information and physical manifestations thereof not generally known or available outside the Company and physical manifestations thereof entrusted to the Company in confidence by third parties . . . ." Trade secrets, processes, techniques, agreements with third parties, supplier and customer lists, price lists, and contract information were all among the non-exclusive list of items covered by the Confidentiality Agreement.

21.     Under the Confidentiality Agreement, Nance was notified of his rights under Defend Trade Secrets Act of 2016 ("DTSA").

22.     Under the Confidentiality Agreement, Nance promised that "[a]t the time of termination of the [employment relationship], I will deliver to the Company (and will not keep in

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES 5
61685-001\103016737

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

my possession, recreate or deliver to anyone else) any and all devices, records data, notes, reports, proposals, lists, correspondence, specifications . . . materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns."

23.     Through the Confidentiality Agreement, Nance agreed to inform "any entity or person with whom I may seek to enter into a business relationship . . . of my contractual obligations under this Agreement."

24.     The Confidentiality Agreement included a Washington choice of law provision and an acknowledgment that a violation would entitle the Company "to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such bond or security is required, that a $1,000.00 bond will be adequate). . . ."

25.     At no point did Ellipse Global release Nance from his obligations under these agreements or otherwise allow him to take, hold, or use the Company's confidential information for his private benefit or the benefit of Ellipse Global's competitors.

**Ellipse Global Takes Commercially Reasonable Steps to Maintain the Secrecy and Protection of its Proprietary Information and Data**

26.     Ellipse Global takes reasonable steps to maintain the confidentiality of its confidential, proprietary and trade secret information, including protection of the information by limited access, password protection, physical locks and safes, and the use of strategic restrictive covenants to protect intellectual property and human capital.

STOKES LAWRENCE, P.S.
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

27.     Ellipse Global provides its employees computers for business purposes.  The computers require log in and password credentials to use the device and to access Ellipse Global's network and servers.

28.     Ellipse Global has commercially reasonable policies in place designed to maintain the confidentiality of its confidential, proprietary and trade secret information.  These policies are enumerated in the Ellipse Global Employee Handbook and include: Employee Conduct (Section 7.1), Company Property (7.5), Confidential Company Information (7.6), Computer Software and Unauthorized Copying (7.7), and Email and Internet Usage (7.8), among others.  Nance was aware of his obligations to the Company under the Company Handbook and signed an acknowledgement form regarding his receipt and understanding of the Employee Handbook.

## Defendant Nance's Resignation from Ellipse Global

29.     On January 14, 2022, Nance announced his resignation from Ellipse Global and offered to make January 28, 2022 his last day of employment.

30.     During a discussion with Holm, Nance stated that he was "not happy with current management" and that he was "going to move on."  When asked where he was going, Nance said he did not have another job lined up and that he was "going to take some time."

31.     Soon after Nance's sudden and unexpected tender of resignation, Holm discovered that Nance had solicited one of his subordinates, Business Development Manager Alanna Caffarel ("Caffarel") to join him at USA Up Star and that Nance had asked her to assist him in the diversion of Ellipse Global customers.

32.     According to its website, USA Up Star is engaged in the same line of business as Ellipse Global.  Specifically, it is a service provider for large-scale operations and special event

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES 7
61685-001\103016737

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

needs with a deployment fleet of portable shower, laundry and bathroom trailers. USA Up Star is based out of Greenwood, Indiana and its Owner and CEO is Klayton South ("South").

33.     As detailed below, a forensic review of Nance's work-issued computer revealed that a draft employment agreement from USA Up Star (authored by Klayton South) was moved to the Recycle Bin on January 13, 2022.

34.     During the week of January 16-20, 2022, Holm learned Nance had informed Ellipse Global clients of his departure and provided false information to clients regarding forthcoming pricing increases by Ellipse Global.

35.     Holm also learned that Nance made derogatory remarks about Ellipse Global's leadership to multiple people in the Company, specifically including his own subordinates.

36.     As a result of the foregoing, Ellipse Global decided to accelerate Nance's departure to January 21, 2022.

### Nance's Efforts to Solicit Employees and Divert Customers

37.     As early as mid-December 2021, Nance informed Caffarel that he had an offer from a competitor he eventually identified to her as USA Up Star. He noted that the other company "wanted him bad" and had made him a "big offer."

38.     Nance solicited Caffarel to join him. He told her that he wanted to focus on sales and have her manage client accounts. Nance initiated several conversations during the Ellipse Global business day, many of which took place on Ellipse Global's Microsoft Teams software.

39.     Nance told Caffarel about his intended departure timing. He told her that he wanted to make sure he received his commissions from Ellipse Global before resigning. He also made clear to her that he was already collaborating with USA Up Star prior to his departure from Ellipse Global. Nance told her he was "moving files" to an external hard drive and commented that he

was already working on several accounts for USA Up Star including, upon information and belief, Ellipse Global customer KBR, Inc. ("KBR").

40.     Nance was scheduled to meet with a specific Ellipse Global customer in Los Angeles with Caffarel on Monday, January 17, 2022.  After receiving Nance's resignation on Friday, January 14, 2022, Holm instructed Nance not to make the trip.  Upon information and belief, Nance contacted the client to advise that he was not coming to the meeting and that Holm would likely raise pricing on the customer.  Upon information and belief, Nance provided the Ellipse Global customer with his new contact information.

41.     Over that intervening weekend, Nance repeatedly contacted Caffarel to ask her to make the trip even though he was not going.  He told her that she should tell the client that Nance was going to a new company where he could provide a better deal.

**Nance's Misappropriation of Ellipse Global's Confidential Information and Trade Secrets While Still Employed by Ellipse Global**

42.     On January 27, 2022, counsel of record retained Vestigant LLC ("Vestigant"), a technology and computer forensics consulting firm, to perform a forensic review of a computer used by Ken Nance while he was an employee at Ellipse and to establish a timeline of activity on the device.

43.     At the time of his resignation, Nance was using a HP EliteBook 850 G6 computer bearing serial number 5CG951B0D9 (the "Nance Computer").

44.     Utilizing industry standard forensic tools, Vestigant created a forensic bit stream image of the Nance Computer.  A forensic bit stream image is an exact duplicate of all data in the computer's hard drive, both active and recoverable deleted information.  The imaging process completed successfully and no errors were reported.  Vestigant performed all subsequent investigation on the forensic bit stream image.

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

45.    Vestigant reviewed the Nance Computer for specific artifacts that identify the attachment of USB Storage Devices to the computer. Based upon this review, Vestigant identified that on December 28, 2021 at 10:47 pm, an external USB Maxtor Y080L0 80GB hard drive was attached to the Nance Computer for the first time ("Maxtor Hard Drive"). This was the first time ever that a USB Storage Device was attached to the Nance Computer.

46.    Nance did not return the Maxtor Hard Drive to Ellipse Global upon the cessation of his employment. Upon information and belief, he remains in possession, custody and/or control of the Maxtor Hard Drive and all file content contained on that USB Storage Device.

47.    Between December 28, 2021 and January 20, 2022 a user with the profile "Ken Nance" opened at least 60 files and folders that existed on the Maxtor Hard Drive, including files that contain Ellipse Global proprietary and confidential information.

48.    Forensic review confirms that all of the files listed on the Maxtor Hard Drive Partial File List were opened between the dates of December 28, 2021 and January 20, 2022 and existed in folders with names including "EG Contracts," "EG HR," and "EG Operations."

49.    There is a folder in the path \Users\Ken Nance\Ellipse Global\EG Team Site – Documents\ ("EG Team Site Folder") on the Nance Computer. The vast majority of the files listed on the Maxtor Hard Drive Partial File List have corresponding file names in the EG Team Site Folder.

50.    Further, upon review of the content of EG Team Site Folder, Vestigant was able to determine that there are approximately 38,000 files and folders that had a Last Access Date updated between December 29, 2021 and January 21, 2022. In the Windows Operating System, when a file is copied from a local computer to an external device, the Last Access Date may be updated. Given that all of the files and folders that were opened from the Maxtor Hard Drive also had

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

corresponding file and folders that exist on the Nance Computer, it is consistent that all the files that have Last Access Dates updated between December 29, 2021 and January 21, 2022 were also copied to the Maxtor Hard Drive.

51.      In sum, the files and folders referenced in the preceding paragraphs from the EG Team Site Folder amount to approximately 60 GB of data, which could easily fit on the Maxtor Hard Drive.

52.      Many of the file path names that are files known to be resident on the Maxtor Hard Drive include information that is proprietary to Ellipse Global.

53.      Nance copied myriad files from the "EG Contracts" folder that include technical data and pricing information and contract terms.  By way of example only, documents with the file paths "E:\Contracts\State of AL - RFP 03121031RF002 - Incident Catering - Pricing.docx" and "E:\Contracts\State of AL - RFP 03121031RF002 - Incident Catering - Technical.docx" were copied from the Nance Computer to the Nance's Maxtor Hard Drive and specifically include Ellipse Global's confidential and proprietary information regarding pricing and technical capabilities.  These documents have independent economic value to Ellipse Global and were securely maintained to be protected from third-party or public consumption.  Notably, Nance was not involved with this contract on behalf of Ellipse Global, yet accessed it as recently as January 10, 2022.

54.      Upon information and belief based on the forensic investigation, Nance is also in possession, custody and/or control of management presentations, support services pricing templates, quotes in response to requests for quotes, Ellipse Global income statement information, and file materials regarding "2022 opportunities."  These documents have independent economic

STOKES LAWRENCE, P.S.
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

value to Ellipse Global and its competitors and were securely maintained to be protected from third-party or public consumption.

55.    Moreover, upon information and belief based on the forensic investigation, Nance is in possession or control of Ellipse Global operations documents from 2020 and 2021 which specifically include Ellipse Global's technical approach and pricing structure.  Nance took information regarding Ellipse Global's largest customer, KBR, and rental information for major customer Goldenvoice Coachella.  These documents have independent economic value to Ellipse Global and its competitors and were securely maintained so as to be protected from third-party or public consumption.

56.    Forensics only reflect a small percentage of documents that are known to reside on the Maxtor Hard Drive.  However, metadata on the Nance Computer – specifically the timing that certain files and folders were accessed in quick succession – permit an allegation, upon reasonable information and belief, that Nance indeed copied nearly 60GB of date to the Maxtor Hard Drive between December 28, 2021 and January 20, 2022.

57.    In addition to the files believed to be in Nance's continued possession, custody or control, Nance also sent himself emails from his work email address - kenn@ellipse-global.com to his personal email address - kennance22@yahoo.com.

58.    These emails contain project proposals made by existing and potential Ellipse Global clients in which services are requested of Ellipse Global.  Nance did not respond to either proposal using his work email address, and did not make anyone at Ellipse Global aware of these emails.  As part of his job as Director of Sales, Nance was expected to make Ellipse Global aware of business opportunities such as these.

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

59.     Ellipse Global would have taken action on these potential business opportunities if it had been made aware of them.

60.     Further, investigation of the Nance Computer shows that the user "Ken Nance" placed a PDF file into the Recycle Bin on or around January 13, 2022.  This file had a creation date of December 10, 2019 and a file name of "Ken Employment Agreement (rev. draft 07.15.2021) (002).pdf."  The file was authored by Klay South and appears to be an employment agreement between USA Up Star, LLC and "Dirk Totten."

61.     In sum, while still employed by Ellipse Global, Nance accessed and transmitted Ellipse Global's confidential information and trade secrets to himself for his and his future employer's use.  This conduct violates Nance's contractual obligations and his obligations under federal and state law.

**Ellipse Global Inadvertently Pays Nance Commissions Significantly Above His Contractual Entitlement**

62.     Pursuant to his August 2020 offer letter from Ellipse Global in connection with his promotion to National Director of Sales, Nance was to be paid an annual salary of $90,000 and would be "eligible to receive discretionary bonuses pursuant to an incentive bonus compensation program ('Incentive Program') to be established by the Company."

63.     Under the offer letter, Nance would have an "opportunity to earn a bonus on deals over $1,000,000."  However, Ellipse Global retained the "sole and absolute discretion" to determine whether a bonus was earned under the incentive program, and this determination "will be final and binding."

64.     In 2020, Ellipse Global paid Nance a $30,000 bonus, which was in line with the prior bonuses he received during his tenure with Ellipse Global.  That year, the first year of the

STOKES LAWRENCE, P.S.
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

COVID-19 pandemic and the year in which Nance was promoted just ahead of the fourth quarter, this bonus was in addition to the $25,000 per year salary raise Nance received in conjunction with his promotion.

65.    For 2021, Ellipse Global instituted a commissions program for Nance, which provided that he would receive a commission for projects that he directly generated and managed, subject to a number of conditions.

66.    Under the plan, such commissions were to be based on the Net Income of each project, which was defined by the formula "Revenue – Cost of Goods Sold – SGA [selling, general, and administrative] expense = Net Income."

67.    Commissions were to be calculated according to the profitability of each project, with projects more than 50% profitable subject to a 3% commission rate, projects between 25% and 50% profitable subject to a 2% commission rate, and projects less than 25% profitable not eligible for a commission.

68.    Ellipse Global made two commissions payments to Nance that were based on an inadvertent miscalculation of the commission that was inconsistent with the terms of the offer letter and the written 2021 commissions program.

69.    On November 12, 2021, Ellipse Global paid Nance a $241,907.48 commission that covered the period of January 1, 2021 to August 31, 2021.

70.    Then, on February 4, 2022, after Nance left the company and in a good faith effort to provide Nance commissions owed on sales completed while he was with the company, Ellipse Global paid Nance $307,783.45.

71.    Both of these payments were orders of magnitude above Nance's prior commissions and bonuses with the company, including his $30,000 bonus for 2020.

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

72.     Based on a thorough review of income statements and financial records, Ellipse Global subsequently realized that it had significantly overpaid Nance based on the terms of the agreement.

73.     Specifically, the calculation of both of these large payments did not take into account (1) SGA for each project; (2) application of the commissions rate to "net income" (a defined term in the 2021 commission plan) rather than gross revenues; and (3) the offer letter's limitation of commissions to projects worth over $1,000,000.

74.     Accordingly, Nance was paid a significantly larger amount by Ellipse Global than what he was entitled to under the offer letter and the 2021 commission plan, and has thereby been unjustly enriched in excess of $400,000.

**Nance is Professionally Affiliated With, USA Up Star**

75.     Investigation of the Nance Computer in February 2022 suggested that Nance and USA Up Star President Klayton South were negotiating an employment agreement for Nance while Nance was employed by Ellipse Global.

76.     Despite contractual obligations to disclose to Ellipse Global the identity of new employers or business affiliations, Nance has made no such disclosure.

77.     Since separating from Ellipse Global, and having misappropriated Ellipse Global's confidential information and trade secrets, Nance has continued to solicit Ellipse Global's clients and business opportunities to advance his personal interests and those of his new employer, USA Up Star.

78.     After Nance separated from employment, Ellipse Global, through counsel, contacted South on January 24, 2022 to inquire into Nance's employment with USA Up Star and to put South on notice of Nance's contractual obligations and recent actions.  South wrote back, despite mounting evidence, "Ken does not work for me at all, you have been misinformed."

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

79.    Notwithstanding South's statement, in late January 2022 Nance contributed to USA Up Star's bid on a contract that was directly competitive with Ellipse Global's bid on the same contract.

80.    On January 26, 2022, one of Ellipse Global's most important clients, KBR, Inc., sent an email to Nance's Ellipse Global email address inquiring into a contract proposal Nance recently submitted on behalf of USA Up Star.  Presumably, KBR inadvertently sent the email to Nance's old address.

81.    Documents attached to the email from KBR reflect that USA Up Star submitted the proposal and that Nance was involved in editing the documents submitted as part of USA Up Star's bid.

82.    This email reveals that, within days of leaving Ellipse Global, Nance assisted USA Up Star in submitting a bid on a contract with one of Ellipse Global's most important clients. Ellipse Global also bid on this contract and, indeed, the request for proposal was posted while Nance was still employed by Ellipse Global.

83.    Based on the timeline—Nance's last day of employment with Ellipse Global was Friday, January 21 and he submitted this bid on behalf of USA Up Star on Wednesday, January 26—it is probable that Nance began preparing this bid while still employed by Ellipse Global, and that he prepared the bid using Ellipse Global's confidential, trade secret information.

84.    Prior to his departure, Nance was aware of, and specifically involved in, developing and procuring the following, non-exclusive list of solicitations that were then-open or not submitted at the time of his departure: KBR – Fuel Service, Ft. Hood; KBR – Reefers, Ft. Hood; KBR – Turnkey Laundry Services, Ft. Hood; KBR – Turnkey Showers & Restroom with Custodial & SST, Ft. Hood.

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

85.    Nance remains in possession, custody and/or control of myriad Ellipse Global files related to pricing and technical specifications for these opportunities.

86.    Upon discovering Nance's misconduct in January 2022, Ellipse Global sent multiple letters to Nance that sought to stop his misconduct.  These letters were not responded to until February 17, 2022, when counsel for Nance first contacted counsel for Ellipse Global.

87.    Counsel for Ellipse Global informed counsel for Nance that it was prepare to file litigation and that it would refrain from initiating litigation upon Nance's written agreement that he would: (1) not access or use Ellipse Global's confidential information during the pendency of settlement discussions; (2) not commence employment or provide services to USA Up Star during the pendency of settlement discussions; and (3) not consider the time between the intended filing of the lawsuit (on February 24) and any subsequent period as "delayed prosecution" of Ellipse Global's claims.

88.    Ellipse Global refrained from filing a lawsuit and pursued a resolution in good faith based on the written agreement of the parties, memorialized in email correspondence between counsel on February 24, 2022.

89.    Counsel engaged in settlement negotiations based on this assumption.  Despite Ellipse Global's efforts to expedite resolution of the theft of its trade secrets and other legal claims, including disputes over commissions payments, negotiations dragged on for more than two months without resolution.

90.    On or about April 18, 2022, Ellipse Global became aware of a series of photos posted on Facebook by USA Up Star CEO Klayton South.  These photos are attached as **Exhibit C**.  The photos appear to show Nance on a corporate jet with a team of USA Up Star employees, including South.  South's post stated that he was travelling back to Greenwood, Indiana from

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES 17
61685-001\103016737

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

Orlando, Florida, the site of the 2022 National Hurricane Center Conference, with a USA Up Star "team."

91.     Specifically, South's Facebook post was captioned, "We killed this event!! Thanks to my amazing team! We had both corporate jets rolling!!"  Two of the three photographs posted by South were from a private jet, and included Nance wearing a bright blue polo shirt, alongside a number of USA Up Star employees in matching navy USA Up Star polo shirts.

92.     Nance was evidently a member of the USA Up Star "team" at the National Hurricane Center Conference.  Indeed, the 2022 National Hurricane Center Expo Floor Plan lists "Ken Nance USA Up Star" as one of the members of the USA Up Star sales booth.  Screenshots of this listing are attached as **Exhibit D**.

93.     Nance breached his express written agreement with Ellipse Global, specifically his agreement that he would "not commence employment or provide any professional services as a consultant or otherwise, to USA Up Star," during the pendency of good faith settlement negotiations.

94.     This Complaint is necessitated by Nance's breach of a fundamental pillar of the agreement to pursue settlement—his affiliation with USA Up Star—and the lack of expeditious resolution of Ellipse Global's claims.

**Ellipse Global Has Been and Will Continue to Be Irreparably Harmed by Nance's Actions**

95.     The harm to Ellipse Global caused by Nance's misappropriation of trade secrets, breaches of contract, and breach of his duty of loyalty is irreparable and impossible to quantify.

96.     Upon information and belief, Nance stole Ellipse Global's trade secret information, including proprietary processes, technical approaches, pricing information, client lists and relationships, sales strategies, past contracts and bids, and contract bidding templates, and gave

them to a direct competitor. Nance has irreparably damaged Ellipse Global's client goodwill, client relationships, and proprietary edge in the marketplace.

97.     Additionally, the harm caused by giving Ellipse Global's trade secrets to a direct competitor is exceptionally difficult to accurately quantify.  It will be difficult to assess which contract bids were lost due to this misappropriation in the past and going forward.  It will also be difficult to measure the extent to which USA Up Star's access to this information will undermine Ellipse Global's market edge in the future, and it will be difficult to quantify the reciprocal benefits and losses stemming from this theft of client goodwill.

98.     Nance's comments to clients and customers, in which he undermined Ellipse Global to benefit USA Up Star, caused irreparable harm to Ellipse Global's client goodwill and relationships.  Nance's continued employment with a direct competitor so soon after leaving Ellipse Global—and after he agreed to refrain from competing with Ellipse Global during efforts to resolve this dispute—compounds this irreparable harm.

99.     Because these breaches and trade secret misappropriations are ongoing and will continue as long as duties are breached and trade secrets are misappropriated, money damages will not adequately compensate Ellipse Global and the misconduct will continue to occur.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

100.     Plaintiff realleges and incorporates the preceding paragraphs by reference as though set forth fully herein.

101.     Ellipse Global owns and possesses highly unique and valuable information related to its business—specifically, as relevant to this Complaint: (1) protected customer information

STOKES LAWRENCE, P.S.
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

(customer lists, pricing, bids, quotes, opportunities, contacts, preferences, purchasing history, sales volume, frequencies/schedules, and certificates); (2) protected financial and operational information (operational strengths and weakness, profit and loss information, budgets and forecasts, business plans, growth and marketing strategies, and pricing strategies); and (3) protected contractor and vendor information (preferred vendor sources for products; vendor purchasing histories; compilations of vendor pricing, rates, and services with relationship discounts; vendor lists containing contact information for key decision-makers; vendor preferences; contractor lists containing contact information; preferred contractors for certain geographic regions or customers; contractor pricing, rates, discounts, and mark-ups; and specialized services performed by contractors). This compiled information is confidential, proprietary, not generally known to the public, and constitutes trade secrets within the meaning of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq* ("DTSA").

102.    Ellipse Global is headquartered in Washington and regularly transacts business throughout the continental United States, including in person and by phone, internet, and mail.

103.    Ellipse Global's trade secrets relate to this business and are used by Ellipse Global in interstate commerce.

104.    Ellipse Global has taken reasonable measures to keep this information secret and confidential, including but not limited to requiring its employees with access to such information to sign confidentiality agreements, requiring employees to abide by confidentiality and IT usage policies, password-protecting access to Ellipse Global's electronically stored information, physical and technical security measures related to its facilities, limiting access rights to certain information, and using confidentiality disclaimers on emails transmitted to third parties.

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

105.    This information has independent economic value because it is not generally known to, and is not readily ascertainable by proper means by, persons, other than Ellipse Global, GWFS, and their employees and agents, who could obtain economic value from its disclosure or use. Ellipse Global compiled its confidential and trade secret information over many years and at great expense.

106.    Defendant Nance, by engaging in and continuing to engage in the conduct and activities described herein, has violated the DTSA through his improper acquisition, disclosure, and use of Ellipse Global's trade secrets, which constitutes actual and threatened misappropriation.

107.    Upon information and belief, Nance has performed the same or highly similar work for USA Up Star that he performed for Ellipse Global.

108.    Upon information and belief, Nance continues to have access to Ellipse Global's trade secrets without permission.

109.    Nance has actually used, plans to use, and/or will inevitably use, Ellipse Global's trade secrets on behalf of USA Up Star.

110.    Nance owes Ellipse Global a statutory duty to maintain the secrecy of its information.

111.    Nance knew or had reason to know, and continues to know or have reason to know, of that duty at the time he misappropriated Ellipse Global's information without Ellipse Global's consent.

112.    Ellipse Global has suffered and will continue to suffer irreparable harm as a result of Nance's unlawful conduct and the disclosure and misappropriation of Ellipse Global's confidential information and trade secrets.  Nance's activities will result in a substantial loss of business for Ellipse Global, now and in the future. Ellipse Global has no adequate remedy at law

1  because Nance's actions are affecting its goodwill, reputation, and ability to compete in a highly

2  competitive marketplace.  Ellipse Global, therefore, is entitled to injunctive relief to prevent further

3  irreparable harm under the DTSA.

4      113.    Nance's actions were willful, malicious, and intended to injure Ellipse Global and

5  its business.

6      114.    As a direct and proximate result of Nance's misappropriation, Ellipse Global has

7  suffered irreparable harm, injuries, and damages, and will continue to suffer irreparable harm,

8  injury, and damages, including but not limited to loss of relevant market share, injury to business

9  reputation and goodwill, loss of profits, and attorneys' fees and costs.  Nance has gained an unfair

10  competitive advantage and other unjust enrichment through the misuse of Ellipse Global's trade

11  secrets.

12      115.    Under the DTSA, Ellipse Global is entitled to and requests permanent injunctive

13  relief against Nance to prohibit his use of Ellipse Global's trade secrets.

14      116.    Under the DTSA, Ellipse Global is entitled to and requests an award of damages in

15  its favor for actual loss caused by the misappropriation, damages for all unjust enrichment caused

16  by the misappropriation that is not addressed in computing damages for actual loss, and/or

17  damages measured by imposition of liability for a reasonable royalty for the unauthorized

18  disclosure or use of Ellipse Global's trade secrets.

19      117.    Under the DTSA, Ellipse Global is entitled to and requests exemplary damages in

20  an amount not more than two times Ellipse Global's actual damages, plus reasonable attorneys'

21  fees.

22

23

24

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

1

2

## SECOND CAUSE OF ACTION
## VIOLATION OF THE WASHINGTON UNIFORM TRADE SECRETS ACT, 19 RCW
## Chap. 19.108

3

4

118.   Ellipse Global realleges and incorporates the preceding paragraphs by reference as though set forth fully herein.

5

6

119.   The information that Nance misappropriated, as set forth in the preceding paragraphs of this Complaint, constitutes trade secrets as defined by RCW 19.108.010(4).

7

8

120.   Nance willfully and maliciously misappropriated and/or disclosed Ellipse Global's trade secrets.

9

10

121.   As an actual and proximate result of Nance's misappropriation of trade secrets, Ellipse Global has been harmed and continues to be harmed.

11

12

## THIRD CAUSE OF ACTION
## BREACH OF CONTRACT
## (Confidentiality Agreement)

13

14

122.   Plaintiff realleges and incorporates the preceding paragraphs by reference as though set forth fully herein.

15

16

123.   Ellipse Global and Nance are parties to a valid and binding contract, the Confidentiality Agreement, which is supported by adequate consideration.

17

18

19

20

21

22

124.   The Confidentiality Agreement obligates Nance, during his employment and for all time, not to disclose Ellipse Global's confidential information (as specifically defined) other than for the benefit of the company and to the extent necessary to perform his obligations to the Company.  He specifically agreed that he would "not disclose to any person, firm, corporation, or other entity" Ellipse Global's confidential information, and that he would "not make copies of such Confidential Information" except as authorized.

23

24

STOKES LAWRENCE, P.S.
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

125.    Under the Confidentiality Agreement, Nance promised that "[a]t the time of termination of the [employment relationship], I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records data, notes, reports, proposals, lists, correspondence, specifications . . . materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns."

126.    Through the Confidentiality Agreement, Nance agreed to inform "any entity or person with whom I may seek to enter into a business relationship . . . of my contractual obligations under this Agreement."

127.    At no point did Ellipse Global release Nance from his obligations under the Agreement or otherwise allow him to take, hold, or use the Company's confidential information for his private benefit or the benefit of Ellipse Global's competitors.

128.    Some or all of the documents and data that Nance copied onto external hard drives, emailed to his personal email account, or otherwise copied or possessed, constituted "confidential information" as defined in the Confidentiality Agreement.

129.    Nance's actions, described herein, in which he copied, possessed, disclosed, and used for private benefit and the benefit of Ellipse Global's competitors Ellipse Global's confidential information, violated the terms of his Confidentiality Agreement.

130.    Upon information and belief, Nance has not returned and maintains possession, custody and/or control over Ellipse Global's confidential information, data, and other property. Such property has been or could be transmitted from the Maxtor Hard Drive and Nance's email account to other devices, storage facilities, and persons.

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES 24
61685-001\103016737

STOKES LAWRENCE, P.S.
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

131.    As a result of Nance's breach, Ellipse Global has suffered damages, including lost business and loss of business reputation.  These damages are ongoing and continually accruing.  Moreover, as a result of Nance's breach, Ellipse Global has suffered and continues to suffer irreparable harm and seeks an injunction against Defendant Nance.

132.    Nance specifically acknowledged that a breach of the Confidentiality Agreement may give rise to irreparable harm justifying temporary, preliminary, and permanent injunctive relief and the waiver of any bond requirement.  Indeed, Ellipse Global has suffered such irreparable harm as a result of Nance's breach of his Confidentiality Agreement and seeks all such extraordinary remedies.

## FOURTH CAUSE OF ACTION
## RESTITUTION/UNJUST ENRICHMENT

133.    Plaintiff realleges and incorporates the preceding paragraphs by reference as though set forth fully herein.

134.    Nance's entitlement to receive a commission from Ellipse Global was subject to the limitations of his offer letter and the 2021 commissions plan.  Those limitations included that commissions were to be paid based on net income for the covered projects, SGA would be used to calculate net income and profitability, and commissions would be available only for projects worth over $1,000,000.

135.    Ellipse Global made two large commission payments to Nance in 2021 and 2022 that were based on a number of inadvertent calculation errors, including the failure to properly account for SGA, application of the commission rate to gross revenues rather than net income, and the payment of commissions for projects that were worth less than $1,000,000.  These payments, which totaled $549,691, were well in excess of Nance's entitlement under the offer letter and 2021 commissions plan.

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

136.    Through these payments, Nance received a benefit at Ellipse Global's expense that he was not entitled to.

137.    It would be unjust for Nance to retain this benefit without repaying Ellipse Global the amount by which he was overpaid.

138.    Furthermore, considering Nance's conduct during and after his employment with Ellipse Global that violated his duty of loyalty and other legal obligations to Ellipse Global, it would be unjust for Nance to retain this commissions overpayment.

139.    Ellipse Global is entitled to equitable recovery of the amounts by which Nance was overpaid.

**FIFTH CAUSE OF ACTION**
**BREACH OF THE DUTY OF LOYALTY**

140.    Plaintiff realleges and incorporates the preceding paragraphs by reference as though set forth fully herein.

141.    During his employment with Ellipse Global, Ken Nance owed a fiduciary duty to Ellipse Global, his employer, not to actively exploit his position for his own personal benefit or hinder the ability of Ellipse Global to continue the business for which it was developed.

142.    Through the course of his employment with Ellipse Global, Nance had access to confidential information, including complete and intimate familiarity with customers, business and development plans.

143.    Nance actively promoted his personal interests and the interests of USA Up Star, a competing business, and diverted and solicited Ellipse Global's customers to USA Up Star while still employed by Ellipse Global, removed confidential information to the benefit of a competitor, and recruited employees of Ellipse Global to leave with him to the benefit of a competitor in breach of his duty of loyalty to Ellipse Global.

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

144.   After Nance's separation from Ellipse Global, Nance continues to owe a duty of loyalty to not disclose or otherwise use Ellipse Global's trade secrets.

145.   Nance's conduct breached the duty of loyalty he owed to Ellipse Global.

146.   As an actual and proximate result of Nance's breach of the duty of loyalty, Ellipse Global has been harmed and continues to be harmed.  Nance's conduct directly and proximately caused Ellipse Global to suffer damages, including lost business, and lost value for the compensation it paid Nance when he was acting on behalf of USA Up Star, or his own behalf to the detriment of Ellipse Global.

**SIXTH CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(February 24, 2022 Agreement)**

147.   Plaintiff realleges and incorporates the preceding paragraphs by reference as though set forth fully herein.

148.   Ellipse Global and Nance are parties to a valid and binding contract, the February 24, 2022 email agreement, which is supported by adequate consideration.  Specifically, Ellipse Global agreed not to immediately file suit and to pursue out-of-court settlement, and Nance agreed to certain post-employment conduct.

149.   The February 24, 2022 Agreement obligated Nance to: (1) refrain from accessing or using Ellipse Global's confidential information during the pendency of settlement discussions; (2) not commence employment or provide services to USA Up Star during the pendency of settlement discussions; and (3) not consider the time between the intended filing of the lawsuit (on February 24, 2022) and any subsequent period as "delayed prosecution" of Ellipse Global's claims.

150.   Ellipse Global refrained from filing a lawsuit and pursued a resolution in good faith for over two months, forgoing the ability to promptly recover its confidential information, prevent

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

1    and remedy contractual breaches, and enforce its rights for that period, and incurring additional

2    costs including legal fees.

3    151.    Nance breached his agreement by providing services to USA Up Star, including as

4    a company representative at the 2022 National Hurricane Center Conference in Orlando, Florida.

5    152.    As a result of Nance's breach, Ellipse Global has suffered damages, including

6    delayed vindication of its rights, attorneys' fees, and lost goodwill and other damages from

7    Nance's affiliation and provision of services to Ellipse Global's competitor, USA Up Star.

8    153.    Additionally, through his conduct, Nance has been unjustly enriched by deceiving

9    Ellipse Global into not vindicating its rights or investigating Nance's conduct, and upon

10   information and belief received compensation or other benefits for his service to USA Up Star.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff INCIDENT CATERING SERVICES, LLC, *doing business as* ELLIPSE GLOBAL prays for entry of judgment in favor of Plaintiff and against Defendant KEN NANCE as follows:

a.   A permanent injunction prohibiting Defendant Nance from copying, destroying, misusing, disclosing or otherwise disseminating Ellipse Global's trade secrets and confidential information;

b.   An order requiring Defendant Nance to return all confidential and proprietary information that is the property of Ellipse Global, its clients, or its potential or actual business partners;

c.   An accounting of the commissions overpayments made to Nance by Ellipse Global, and restitution to Ellipse Global for the amount of commissions overpaid to Nance;

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

d. Monetary damages as proven at trial to compensate Ellipse Global for the harm it suffered as a direct and proximate result Nance's violations of state and federal law and his contractual agreements in an amount not to exceed $3,000,000.00;

e. An accounting of any gain received, directly or indirectly, by Defendant Nance by virtue of wrongful acts described herein and disgorgement of any amounts by which Defendant Nance has been unjustly enriched due to the misappropriation of confidential and trade secret information and breaches of contract;

f. Reimbursement of all compensation paid to Nance in any workweek in which he breached his duty of loyalty to Ellipse Global;

g. Punitive damages subject to the limitations set forth under Washington state law;

h. Reasonable attorneys' fees, expert fees, and costs as authorized by RCW 19.108.030; and

i. Such other and further relief as this Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury of all issues so triable as of right by a jury.

DATED this 3rd day of May, 2022.

STOKES LAWRENCE, P.S.

By: s/Molly Terwilliger
    Molly Terwilliger (WSBA #28449)
    1420 Fifth Avenue, Suite 3000
    Seattle, WA 98101-2393
    Telephone:  (206) 626-6000
    Fax:  (206) 464-1496
    E-mail:  molly.terwilliger@stokeslaw.com
    Attorney for Plaintiff

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES 29
61685-001\103016737

STOKES LAWRENCE, P.S.
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

McGuireWoods LLP

David L. Greenspan *pro hac vice pending*
Richard J. Batzler *pro hac vice pending*
1750 Tysons Boulevard, Suite 1800
Tysons, Virginia 22102
Telephone: (703) 712-5000
Fax: (703) 712-5050
E-mail: dgreenspan@mcguirewoods.com
E-Mail: rbatzler@mcguirewoods.com
Attorneys for Plaintiff

STOKES LAWRENCE, P.S.
1420 FIFTH AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

# EXHIBIT A

 

ELLIPSE
G L O B A L

1429 Avenue D, #166
Snohomish, WA 98290
P 360.863.2182

August 25, 2020


Ken Nance
210 119th Dr SE
Lake Stevens, WA  98258


Dear Mr. Nance,

Incident Catering Services, LLC, a Washington limited liability company ("**ICS**" or the "**Company**"), and its subsidiary Ellipse Global is pleased to offer you a change in position with the Company on the terms described below.

1.     **Position.**  You will start in a full-time position as National Director of Sales and you will report to the Company's President.  Your anticipated change will be on August 31, 2020

2.     **Compensation.**  You will be paid a starting salary at the rate of $90,000 per year, payable on the Company's regular payroll dates.

3.     **Incentive Program Bonus/Commission.**   You will be eligible to receive discretionary bonuses pursuant to an incentive bonus compensation program ("**Incentive Program**") to be established by the Company.  Under the Incentive Program, you shall have the opportunity to earn a bonus on deals over $1,000,000.  The Company will determine whether you have earned a bonus pursuant to the Incentive Program (including whether the established performance objectives have been met) in its sole and absolute discretion, which determination will be final and binding.


4.     **Taxes, Withholding and Required Deductions.**  All forms of compensation referred to in this letter are subject to all applicable taxes, withholding and any other deductions required by applicable law.

5.     **Confidential Information.**  Like all Company employees, you will be required, as a condition of your employment, to sign the Company's Confidential Information.  As a condition of your employment, you also agree to know and comply with the Company's policies, which may change from time to time.

6.     **Miscellaneous.**

(a)     **Entire Agreement.**  This letter, together with the Confidential Information and Invention Assignment Agreement, sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating

Offer Letter 1

to the subject matter hereof. This agreement may not be amended or modified, except by an express written agreement signed by both you and a duly authorized employee of the Company.

(b)    **Severability.** The provisions of the agreement are severable. If any provision contained in this agreement shall be held invalid or unenforceable in any respect, such invalidity or unenforceability will not affect the other provisions of this agreement, and such provision will be construed and enforced so as to render it valid and enforceable consistent with the general intent of the parties insofar as possible under applicable law.

7.    **Outside Activities.**  During your employment, you will devote your full business efforts and time to the Company. While you render services to the Company, you will not engage in any other employment, consulting or other business activity (whether full-time or part-time) that would create a conflict of interest with the Company or that would, directly or indirectly, constitute your engagement in or participation in any business that is competitive in any manner with the business of the Company.

8.    **At-Will Employment Relationship.**  Employment with the Company is for no specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause, although the Company will provide you with thirty (30) days' advance notice of any termination without cause. Any contrary representations which may have been made to you are superseded by this agreement. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation, and benefits, as well as the Company's personnel policies and procedures, may change from time to time at the Company's discretion, the "at-will" nature of your employment may only be changed in an express written agreement signed by you and the Company's President.

If you wish to accept this offer, please sign, and date both the enclosed duplicate original of this letter and the enclosed Non-Solicit and Non-Compete Agreement. Our offer is contingent on your understanding and acceptance of the agreements and practices referred to in this letter. As required by law, your employment with the Company is also contingent upon your providing legal proof of your identity and authorization to work in the United States. In addition, the Company reserves the right to conduct background and/or reference checks on all of its potential employees. This offer, if not accepted, will expire at the close of business on Friday August 28, 2020 at 5:00pm Pacific Standard Time.

Truly yours,
INCIDENT CATERING SERVICES, LLC

By: _____

Michael Holm
President

ACCEPTED AND AGREED:
Ken Nance

_____
(Signature)

_8/25/2020_____

Date

Attachment A:  Non-Solicit and Non-Compete Agreement
Confidential Information and Invention Assignment Agreement

# EXHIBIT B

## INCIDENT CATERING SERVICES, LLC

## CONFIDENTIAL INFORMATION AND
## INVENTION ASSIGNMENT AGREEMENT

As a condition of my becoming employed (or my employment being continued) by Incident Catering Services, LLC, a Washington limited liability company, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, the receipt of Confidential Information (as defined below) while associated with the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I hereby agree to the following:

1.    **Relationship.** This Confidential Information and Invention Assignment Agreement (this "Agreement") will apply to my employment relationship with the Company. If that relationship ends and the Company, within one (1) year thereafter, either reemploys me or engages me as a consultant, I agree that this Agreement will also apply to such later employment or consulting relationship, unless the Company and I otherwise agree in writing. Any employment or consulting relationship between the parties hereto, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship."

2.    **Applicability to Past Activities.** The Company and I acknowledge that I may have performed work, activities, services or made efforts on behalf of or for the benefit of the Company, or related to the current or prospective business of the Company in anticipation of my involvement with the Company, that would have been within the scope of my duties under this agreement if performed during the term of this Agreement, for a period of time prior to the Effective Date of this Agreement (the "Prior Period"). Accordingly, if and to the extent that, during the Prior Period: (i) I received access to any information from or on behalf of the Company that would have been Confidential Information (as defined below) if I received access to such information during the term of this Agreement; or (ii) I (a) conceived, created, authored, invented, developed or reduced to practice any item (including any intellectual property rights with respect thereto) on behalf of or for the benefit of the Company, or related to the current or prospective business of the Company in anticipation of my involvement with the Company, that would have been an Invention (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement; or (b) incorporated into any such item any pre-existing invention, improvement, development, concept, discovery or other proprietary information that would have been a Prior Invention (as defined below) if incorporated into such item during the term of this Agreement; then any such information shall be deemed "Confidential Information" hereunder and any such item shall be deemed an "Invention" or "Prior Invention" hereunder, and this Agreement shall apply to such activities, information or item as if disclosed, conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement.

3.    **Confidential Information.**

(a)    **Protection of Information.** I understand that during the Relationship, the Company intends to provide me with certain information, including Confidential Information (as

defined below), without which I would not be able to perform my duties to the Company.  At all times during the term of the Relationship and thereafter, I shall hold in strictest confidence, and not use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.  I shall not make copies of such Confidential Information except as authorized by the Company or in the ordinary course of my obligations to the Company under the Relationship.

(b)      **Confidential Information.**  I understand that "Confidential Information" means any and all information and physical manifestations thereof not generally known or available outside the Company and information and physical manifestations thereof entrusted to the Company in confidence by third parties, whether or not such information is patentable, copyrightable or otherwise legally protectable.  Confidential Information includes, without limitation: (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

(c)      **Third Party Information.**  My agreements in this Section 3 are intended to be for the benefit of the Company and any third party that has entrusted information or physical material to the Company in confidence.  During the term of the Relationship and thereafter, I will not improperly use or disclose to the Company any confidential, proprietary or secret information of my former employer(s) or any other person, and I will not bring any such information onto the Company's property or place of business.

(d)      **Other Rights.**  This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

(e)      **U.S. Defend Trade Secrets Act.**  Notwithstanding the foregoing, the U.S. Defend Trade Secrets Act of 2016 ("DTSA") provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or

investigating a suspected violation of law; or (iii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  In addition, DTSA provides that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

4.    **Ownership of Inventions.**

(a)    **Inventions Retained and Licensed.**  I have attached hereto, as Exhibit A, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date:  (i) have been created by me or on behalf of me, and/or (ii) are owned exclusively by me or jointly by me with others or in which I have an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder (collectively "Prior Inventions"); or, if no such list is attached, I represent and warrant that there are no such Inventions at the time of signing this Agreement, and to the extent such Inventions do exist and are not listed on Exhibit A, I hereby irrevocably and forever waive any and all rights or claims of ownership to such Inventions.  I understand that my listing of any Inventions on Exhibit A does not constitute an acknowledgement by the Company of the existence or extent of such Inventions, nor of my ownership of such Inventions.  I further understand that I must receive the formal approval of the Company before commencing my Relationship with the Company.

(b)    **Use or Incorporation of Inventions.**  If in the course of the Relationship, I use or incorporate into any of the Company's products, services, processes or machines any Invention not assigned to the Company pursuant to Section 4(d) of this Agreement in which I have an interest, I will promptly so inform the Company in writing.  Whether or not I give such notice, I hereby irrevocably grant to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

(c)    **Inventions.**  I understand that "Inventions" means discoveries, developments, concepts, designs, ideas, know how, modifications, improvements, derivative works, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable.  I understand this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon.  I understand that "Company Inventions" means any and all Inventions that I may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship or otherwise in connection with the Relationship, except as otherwise provided in Section 4(g) below.

-3-

(d)    **Assignment of Company Inventions.**  I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all of my right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights and other proprietary rights therein.  I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions.  I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary.  Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights").  To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.  If I have any rights to the Company Inventions, other than Moral Rights, that cannot be assigned to the Company, I hereby unconditionally and irrevocably grant to the Company during the term of such rights, an exclusive, irrevocable, perpetual, worldwide, fully paid and royalty-free license, with rights to sublicense through multiple levels of sublicensees, to reproduce, distribute, display, perform, prepare derivative works of and otherwise modify, make, have made, sell, offer to sell, import, practice methods, processes and procedures and otherwise use and exploit, such Company Inventions.

(e)    **Maintenance of Records.**  I shall keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Relationship.  The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of the Company at all times.  I shall not remove such records from the Company's place of business or systems except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business.  I shall deliver all such records (including any copies thereof) to the Company at the time of termination of the Relationship as provided for in Section 5 and Section 6.

(f)    **Intellectual Property Rights.**  I shall assist the Company, or its designee, at the Company's expense, in every proper way in securing the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments that the Company, or its designee, shall deem necessary in order to apply for, obtain, maintain and transfer, or if not transferable, waive and never assert such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.  My obligation to execute or cause to be executed, when it is in my power to do so, any

-4-

such instrument or papers shall continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any country of the world. I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such instruments and papers and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions. This power of attorney is coupled with an interest and shall not be affected by my subsequent incapacity.

(g)    **Exception to Assignments.** Subject to the requirements of applicable state law, if any, I understand that the Company Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention that qualifies fully for exclusion under the provisions of applicable state law, if any, attached hereto as <u>Exhibit B</u>. In order to assist in the determination of which inventions qualify for such exclusion, I will advise the Company promptly in writing, during and for a period of twelve (12) months immediately following the termination of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the period of the Relationship.

5.    **Company Property; Returning Company Documents.** I acknowledge that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, files, e-mail messages, and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored or reviewed at any time without notice. I further acknowledge that any property situated on the Company's premises or systems and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. At the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

6.    **Termination Certification.** In the event of the termination of the Relationship, I shall sign and deliver the "<u>Termination Certification</u>" attached hereto as <u>Exhibit C</u>; however, my failure to sign and deliver the Termination Certification shall in no way diminish my continuing obligations under this Agreement.

7.    **Notice to Third Parties.** I shall inform any entity or person with whom I may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of my contractual obligations under this Agreement. I acknowledge that the Company may, with or without prior notice to me and whether during or after the term of the Relationship, notify third parties of my agreements and obligations under this Agreement. Upon written request by the Company, I will respond to the Company in writing regarding the status of my employment or proposed employment with any party during the Restriction Period.

8.    **At-Will Relationship**.  I understand and acknowledge that, except as may be otherwise explicitly provided in a separate written agreement between the Company and me, my Relationship with the Company is and shall continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without further obligation or liability, other than those provisions of this Agreement that explicitly continue in effect after the termination of the Relationship.

9.    **Representations and Covenants**.

(a)    **Facilitation of Agreement**.  I shall execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

(b)    **No Conflicts**.  I represent and warrant that my performance of all the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship.  I will not disclose to the Company or use any inventions, confidential or non-public proprietary information or material belonging to any previous client, employer or any other party.  I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer or any other party.  I represent and warrant that I have listed on <u>Exhibit A</u> all agreements (*e.g.,* non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company.  I shall not enter into any written or oral agreement that conflicts with the provisions of this Agreement.

(c)    **Voluntary Execution**.  I certify and acknowledge that I have carefully read all of the provisions of this Agreement, that I understand and have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

10.    **Electronic Delivery**.  Nothing herein is intended to imply a right to participate in any of the Company's equity incentive plans, however, if I do participate in such plan(s), the Company may, in its sole discretion, decide to deliver any documents related to my participation in the Company's equity incentive plan(s) by electronic means or to request my consent to participate in such plan(s) by electronic means.  I hereby consent to receive such documents by electronic delivery and agree, if applicable, to participate in such plan(s) through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

11.    **Miscellaneous**.

(a)    **Governing Law**.  The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and

obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Washington applicable to contracts made and to be performed wholly therein (without regard to principles of conflicts of laws).

      (b)    **Entire Agreement.** This Agreement sets forth the entire agreement and understanding between the Company and me relating to its subject matter and merges all prior discussions between us. No amendment to this Agreement will be effective unless in writing signed by both parties to this Agreement. The Company shall not be deemed hereby to have waived any rights or remedies it may have in law or equity, nor to have given any authorizations or waived any of its rights under this Agreement, unless, and only to the extent, it does so by a specific writing signed by a duly authorized officer of the Company, it being understood that, even if I am an officer of the Company, I will not have authority to give any such authorizations or waivers for the Company under this Agreement without specific approval by the Board of Directors. Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

      (c)    **Successors and Assigns.** This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

      (d)    **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

      (e)    **Severability.** If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected. The Company and I have attempted to limit my right to use, maintain and disclose the Company's Confidential Information only to the extent necessary to protect the Company from unfair competition.

      (f)    **Remedies.** I acknowledge that violation of this Agreement by me may cause the Company irreparable harm, and therefore I agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, that a $1,000.00 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

      (g)    **Advice of Counsel.** I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL

NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

        (h)    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.  Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

*[Signature Page Follows]*

The parties have executed this Confidential Information and Invention Assignment Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

**THE COMPANY:**

**INCIDENT CATERING SERVICES, LLC**

_8-3/20_
(Signature)

Name: Michael Holm
Title: President

Date:

**EMPLOYEE:**

_Ken Nance_
(Signature)

_Ken Nance_
(Print Name)

Date: _8/31/2020_

CONFIDENTIAL INFORMATION AND INVENTION
ASSIGNMENT AGREEMENT OF INCIDENT CATERING SERVICES, LLC

## EXHIBIT A

**LIST OF PRIOR INVENTIONS**
**AND ORIGINAL WORKS OF AUTHORSHIP**
**EXCLUDED UNDER SECTION 4(a) AND CONFLICTING AGREEMENTS**
**DISCLOSED UNDER SECTION 9(b)**

The following is a list of (i) all Inventions that, as of the Effective Date: (A) have been created by me or on my behalf, and/or (B) are owned exclusively by me or jointly by me with others or in which I have an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder and (ii) all agreements, if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company:

| _____Title_____ | _Date_ | Identifying Number or Brief Description |
|---|---|---|

Except as indicated above on this Exhibit, I have no inventions, improvements or original works to disclose pursuant to Section 4(a) of this Agreement and no agreements to disclose pursuant to Section 9(b) of this Agreement.

____ Additional sheets attached

Signature of Employee:_____

Print Name of Employee:_____

Date:_____

## EXHIBIT B

RCW 49.44.140 of the Revised Code of Washington is as follows:

(1)    A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

(2)    An employer shall not require a provision made void and unenforceable by subsection (1) of this section as a condition of employment or continuing employment.

(3)    If an employment agreement entered into after September 1, 1979, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

# EXHIBIT C

Case 2:22-cv-00581-JNW   Document 1   Filed 05/03/22   Page 48 of 53

4:54          LTE

‹                    **Klay's Post**

  **Klay South** is ✈️ traveling to **Greenwood, Indiana** from **Signature Flight Support MCO - Orlando Int'l Airport**.

2h · Orlando · 👥

We killed this event!! Thanks to my amazing team! We had both corporate jets rolling!!

👍❤️ 54                                    5 Comments

👍 Like                    💬 Comment







# EXHIBIT D



